******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# FRANK VANDEVER *v.* COMMISSIONER OF CORRECTION
## (SC 19036)

Rogers, C. J., and Palmer, Zarella, Eveleigh, McDonald,
Espinosa and Robinson, Js.

*Argued May 1—officially released December 30, 2014*

*Frank Vandever*, self-represented, the appellant

(petitioner).

*Madeline A. Melchionne*, assistant attorney general, with whom, on the brief, were *George Jepsen*, attorney general, and *Terrence M. O'Neill*, assistant attorney general, for the appellee (respondent).

*Emily Gerrick*, law student intern, with whom were *Hope Metcalf*, *David McGuire*, and, on the brief, *Sandra Staub*, for the Allard K. Lowenstein International Human Rights Clinic et al. as amici curiae.

*Opinion*

PALMER, J. Under *Sandin* v. *Conner*, 515 U.S. 472, 483–84, 115 S. Ct. 2293, 132 L. Ed. 2d 418 (1995), and *Wilkinson* v. *Austin*, 545 U.S. 209, 222–23, 125 S. Ct. 2384, 162 L. Ed. 2d 174 (2005), prison inmates have a protected liberty interest in avoiding certain conditions of confinement if, pursuant to state statute or regulation, they can be subjected to such conditions only if certain procedural requirements are met, and those conditions impose an atypical and significant hardship in relation to the ordinary incidents of prison life. This certified appeal raises the question of whether Connecticut prisoners have a liberty interest in avoiding administrative segregation[1] at Northern Correctional Institution (Northern), the state's maximum security prison and, if so, whether the self-represented petitioner, Frank Vandever, was afforded due process before his transfer to Northern. The petitioner appeals from the judgment of the Appellate Court, which dismissed his appeal from the habeas court's denial of his petition for certification to appeal from that court's judgment denying his petition for a writ of habeas corpus.[2] The petitioner claims that the Appellate Court incorrectly concluded, contrary to the holdings in *Sandin* and *Wilkinson*, that prisoners in Connecticut do not have a liberty interest in avoiding administrative segregation because the respondent, the Commissioner of Correction, has unfettered discretion to classify them at any security level. See *Vandever* v. *Commissioner of Correction*, 135 Conn. App. 735, 741–42, 42 A.3d 494 (2012). He further claims that his due process rights were violated because the evidence presented at the hearing that he was afforded to contest his placement in administrative segregation at Northern does not support the respondent's placement decision. We agree with the petitioner that the Appellate Court was incorrect insofar as it indicated that under no circumstances can Connecticut prisoners establish a liberty interest in avoiding administrative segregation. We also conclude that the Appellate Court incorrectly determined that the habeas court acted within its discretion in denying the petition for certification to appeal from the judgment of the habeas court because, as we explain more fully hereinafter, the habeas court's reason for denying that petition was itself unsupportable. We nevertheless conclude that it is apparent from the record that, even if the petitioner had a liberty interest in avoiding his transfer to Northern, he received all of the process he was due prior to that transfer. We therefore reverse the judgment of the Appellate Court and direct that court to affirm the habeas court's judgment.

The following undisputed facts and procedural history are relevant to our resolution of this appeal. The petitioner is serving sentences for numerous convictions, including murder and escape from a correctional

institution. In October, 1997, shortly after Department of Correction (department) officials transferred the petitioner to the general population at MacDougall Correctional Institution following his December 31, 1991 escape from what is now the Osborn Correctional Institution (Osborn), certain department personnel found the petitioner in possession of a National Institute of Justice (NIJ) publication entitled "Stopping Escapes: Perimeter Security," which discusses perimeter security at prisons in the United States. The petitioner was charged with a disciplinary violation in connection with this incident and, following a hearing, was found guilty of possession of contraband. As a result, the department sanctioned the petitioner by revoking ninety days of previously earned statutory good time credits, as authorized by General Statutes (Rev. to 1987) § 18-7a (c). Thereafter, the department's Offender Classification and Population Management Unit notified the petitioner that it would conduct a hearing to determine whether he should be placed on administrative segregation status.[3] Following the hearing, at which the petitioner was permitted to present witnesses and to testify on his own behalf, the hearing officer recommended that the petitioner's security classification be increased in level, "with high security monitoring available," but that he not be placed on administrative segregation status. Thereafter, the Inmate Classification Administrator overruled the hearing officer's recommendation and ordered that the petitioner be placed on administrative segregation status. The petitioner was in administrative segregation between November, 1997, and June, 1999, or approximately 570 days. Pursuant to department policy, prisoners in administrative segregation are ineligible to earn statutory good time credits and seven day job credits.[4]

In a prior habeas proceeding, the petitioner had challenged the disciplinary report that was issued in connection with his possession of the NIJ publication. On July 28, 2003, the respondent agreed to withdraw that report and to restore the ninety days of statutory good time that had been revoked as a result of his possession of the NIJ publication.[5] In light of this agreement, the prior habeas petition was dismissed as moot. At that time, the petitioner argued that the department also should credit his sentence to include the good time credits and seven day job credits that he was ineligible to earn while he was in administrative segregation, but the habeas court noted that he would have to raise that claim in a separate habeas petition.

In November, 2003, the petitioner filed the present habeas petition, alleging, inter alia, that the respondent improperly had placed him in administrative segregation on the basis of a disciplinary report that later was expunged. In his prayer for relief, the petitioner claimed that he was entitled to receive the good time and seven day job credits that, under the department's administra-

tive directives, he was ineligible to earn while in administrative segregation.

At the trial on the petitioner's habeas petition, Frederick Levesque, the department's Director of Offender Classification, testified on behalf of the respondent. He explained that, although a disciplinary violation often is the precipitating event that leads to the review of an inmate's eligibility for administrative segregation status, an administrative segregation hearing is not a disciplinary hearing, and placement in administrative segregation is not a form of punishment; rather, it is a management tool that is used to control inmates who are perceived to present the greatest safety and security threats. According to Levesque, the petitioner was placed in administrative segregation after a routine search of his cell turned up the NIJ publication on prison perimeter security. Levesque stated that the petitioner's possession of such a publication so soon after being released from administrative segregation following his escape from Osborn was deemed "highly suspicious" and caused department officials to conclude that the petitioner posed a danger "to the safety and security of . . . [the] facility." With respect to the decision to place the petitioner in administrative segregation, Levesque explained that the petitioner "ha[d] already proven . . . that he [was] very good at escaping. [The] . . . number one mission . . . is to protect the public. Unfortunately, back in 1991, we didn't do a very good job of that. [The petitioner] actually escaped and went and committed . . . additional crime[s] . . . ." Levesque also observed that, in addition to his successful escape in 1991, the petitioner also had attempted to escape from prison two other times.

In its memorandum of decision, the habeas court, in denying the habeas petition, made no findings as to whether the petitioner's placement in administrative segregation was improper on the ground that the evidence presented at the administrative segregation hearing was insufficient to support the respondent's placement decision. Instead, the court denied the habeas petition on the basis of its determination that the petitioner was not entitled to the relief that he was seeking. Specifically, the court stated that "[t]he petitioner . . . never had or presently has a right to the statutory good time and seven day job credits he is seeking. The awarding of such credits always has been and remains solely within the respondent's discretion. . . . Such decisions are discretionary and wholly within the [respondent's] purview in accordance with General Statutes § 18-7a."[6] The habeas court also denied the petitioner's petition for certification to appeal from its judgment.

The petitioner appealed to the Appellate Court, claiming that the habeas court had abused its discretion in denying his petition for certification to appeal because, inter alia, the habeas court had not addressed his con-

tention that, under *Sandin* and *Wilkinson*, his placement in administrative segregation violated his right to due process. See *Vandever* v. *Commissioner of Correction*, Conn. Appellate Court Records & Briefs, March Term, 2012, Petitioner's Brief pp. 12–22. The petitioner maintained that he had a right to due process prior to his placement in administrative segregation, and that he was deprived of that right because that placement was based on an expunged disciplinary report and a prior escape for which he already had completed his period of administrative segregation. See id., pp. 23–27. The petitioner further explained that, contrary to the determination of the habeas court, he had not claimed a constitutional or statutory right to the good time and work credits that he was ineligible to earn while in administrative segregation; rather, he had claimed only that he should be awarded those credits to remedy the due process violation stemming from his unjustifiable placement in administrative segregation. See id., p. 17.

The Appellate Court rejected the petitioner's claims. See *Vandever* v. *Commissioner of Correction*, 135 Conn. App. 741–43. In contrast to the habeas court, the Appellate Court did not base its conclusion on the discretionary nature of the award of good time and work credits. See id., 741–42. But cf. id., 743 (noting that "the respondent ha[s] the discretion to award [or not to award statutory] good time credits . . . and ha[s] the authority to promulgate rules that make an inmate ineligible to earn statutory good time" in concluding that "[t]he petitioner had no protected liberty interest in 'good time' not yet credited" [citation omitted]). Like the habeas court, however, the Appellate Court did not address the petitioner's contention that, under *Sandin*, he had a protected liberty interest in avoiding administrative segregation, or that the process that he received prior to his transfer to Northern was constitutionally deficient. The Appellate Court concluded, instead, that "[i]nmates do not have a constitutionally protected right to a particular classification. . . . Discipline by prison officials in response to a wide range of misconduct falls within the expected perimeters of a sentence imposed by a court of law. . . . In order to state a claim of a violation of due process, an inmate must show a protected liberty interest and a deprivation of that interest without being afforded due process of law. A prisoner's liberty interest to be free from disciplinary segregation is not inherent in the due process clause of the federal constitution. . . . Under Connecticut law, the Commissioner of Correction retains discretionary authority to classify prisoners at any security level. . . . A prisoner has no constitutionally protected interest in or to a particular classification." (Citations omitted; internal quotation marks omitted.) Id., 741–42. The Appellate Court ultimately determined that the habeas court had not abused its discretion in denying the petition for certification to

appeal and dismissed the petitioner's appeal. Id., 743.

On appeal to this court following our grant of certification, the petitioner reasserts his claim that he had a protected liberty interest in avoiding administrative segregation and that his transfer to Northern violated his right to due process because it was based on a disciplinary report that later was expunged, and a prior escape for which he already had completed his period of administrative segregation. At oral argument before this court, the respondent conceded, as he must, that the Appellate Court incorrectly concluded, contrary to the rule in *Sandin* and *Wilkinson*, that, as a matter of law, Connecticut inmates cannot establish a liberty interest in avoiding administrative segregation. The respondent argues, however, that *Wilkinson* and *Sandin* make clear that, when a prisoner has a liberty interest in avoiding administrative segregation, the require-ments of due process are met as long as the prisoner receives notice and an opportunity to be heard prior to being placed in administrative segregation, and there is at least some evidence to support that placement decision. The respondent further contends that, even if the petitioner had a liberty interest in avoiding placement in administrative segregation at Northern, he received all of the process that he was due prior to his transfer there.[7] We agree with the respondent.[8]

The following principles guide our analysis of the petitioner's claim. "In order to prevail on his due process claim, the [petitioner] must prove that: (1) he has been deprived of a property [or liberty] interest cognizable under the due process clause; and (2) the deprivation of the property [or liberty] interest has occurred without due process of law." (Internal quotation marks omitted.) *State* v. *Matos*, 240 Conn. 743, 749, 694 A.2d 775 (1997). Although "the [c]onstitution itself does not give rise to a liberty interest in avoiding transfer to more adverse conditions of confinement . . . a liberty interest in avoiding particular conditions of confinement may arise from state policies or regulations . . . ." (Citations omitted.) *Wilkinson* v. *Austin*, supra, 545 U.S. 221–22. "States may under certain circumstances create liberty interests [that] are protected by the [d]ue [p]rocess [c]lause. . . . But these interests will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the [d]ue [p]rocess [c]lause of its own force . . . nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." (Citations omitted.) *Sandin* v. *Conner*, supra, 515 U.S. 483–84; see also *Sealey* v. *Giltner*, 116 F.3d 47, 52 (2d Cir. 1997) ("a prisoner has a liberty interest only if the deprivation of which he complains is atypical and significant and the state has created the interest by statute or regulation"). Thus, to establish a liberty inter-

est in avoiding administrative segregation, the petitioner was required to prove that state regulations required a hearing before he could be placed in administrative segregation and that the conditions of his confinement at Northern imposed an atypical and significant hardship in relation to the ordinary incidents of prison life.

The respondent does not dispute that, pursuant to one of the department's administrative directives, the petitioner was entitled to notice and a hearing prior to being transferred to Northern, and that the respondent was required to proffer a reason or reasons for concluding that the petitioner poses a threat to safety and security. The first requirement of *Sandin* is therefore met.[9] The respondent maintains, however, that the record is inadequate to review whether the second prong of *Sandin* has been met because the petitioner failed to present evidence concerning the conditions of his confinement at Northern, and, consequently, it is impossible for this court to determine whether those conditions resulted in an atypical and significant hardship in relation to the conditions ordinarily incident to prison life. In response, the petitioner and amici curiae[10] argue that this court can decide whether the second prong of *Sandin* has been met as a matter of law, first, because it is clear from the department's administrative directive that the conditions of confinement at Northern are every bit as harsh as those experienced by the inmates in *Wilkinson*, which the United States Supreme Court concluded "impose[d] an atypical and significant hardship under any plausible baseline"; *Wilkinson* v. *Austin*, supra, 545 U.S. 223; and, second, because the Second Circuit Court of Appeals has determined that 305 days in administrative segregation in a New York maximum security prison, a far shorter period of time than the petitioner spent at Northern, is sufficiently atypical of ordinary prison life to establish conclusively an inmate's liberty interest in avoiding such confinement. See *Colon* v. *Howard*, 215 F.3d 227, 229, 231–32 (2d Cir. 2000). As we previously indicated, however, we need not resolve this issue because, even if we assume that the petitioner had a liberty interest in avoiding administrative segregation at Northern, he received all of the process to which he was constitutionally entitled.

In *Hewitt* v. *Helms*, 459 U.S. 460, 103 S. Ct. 864, 74 L. Ed. 2d 675 (1983), the United States Supreme Court considered the process that is due to a prisoner prior to his placement in administrative segregation. "The requirements imposed by the [due process] [c]lause are, of course, flexible and variable [depending on] the particular situation being examined. . . . In determining what is due process in the prison context, we are reminded that one cannot automatically apply procedural rules designed for free citizens in an open society . . . to the very different situation presented by a disciplinary proceeding in a state prison. . . . Prison admin-

istrators . . . should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security. . . . These considerations convince [the court] that [prison officials are] obligated to engage only in an informal, nonadversary review of the information supporting [an inmate's] administrative confinement, including whatever statement [the inmate] wishe[s] to submit, within a reasonable time after [placement in] administrative segregation." (Citations omitted; internal quotation marks omitted.) Id., 472; see also *Taylor* v. *Rodriguez*, 238 F.3d 188, 192 (2d Cir. 2001) ("[t]he [United States] Supreme Court requires that, assuming the existence of a liberty interest, a prisoner placed in administrative segregation be provided some notice of the charges against him and an opportunity to present his views to the prison official charged with deciding whether to transfer him to administrative segregation" [internal quotation marks omitted]).

"In a variety of contexts, [including the prison context] the [United States Supreme] Court has [also] recognized that a governmental decision resulting in the loss of an important liberty interest violates due process if the decision is not supported by any evidence." *Superintendent* v. *Hill*, 472 U.S. 445, 455, 105 S. Ct. 2768, 86 L. Ed. 2d 356 (1985); see also *Taylor* v. *Rodriguez*, supra, 238 F.3d 194 (when inmate has liberty interest in avoiding transfer to more restrictive conditions of confinement, decision to transfer must be supported by " 'some evidence' "). This standard is a lenient one, requiring only "a modicum of evidence" to support the challenged decision. *Superintendent* v. *Hill*, supra, 455. "Ascertaining whether this standard is satisfied does not require examination of the entire record, independent assessment of the credibility of witnesses, or weighing of the evidence. Instead, the relevant question is whether there is any evidence in the record that could support the conclusion reached by the disciplinary board." Id., 455–56; see also *Castro* v. *Terhune*, 712 F.3d 1304, 1314 (9th Cir. 2013) (characterizing test as " 'minimally stringent' ").

In the present case, the petitioner does not dispute that the procedures that he was afforded prior to being placed in administrative segregation exceeded those to which he was constitutionally entitled under *Hewitt*. As we discussed previously, prior to being transferred to Northern, the petitioner was provided with written notice of the reasons for the transfer followed by a hearing at which he was allowed to present evidence and argument as to why the transfer was unwarranted. The petitioner was also given the option of having a staff advocate represent him at the hearing. The petitioner's contention, rather, is that the respondent's reasons for placing him in administrative segregation were invalid because the disciplinary report relating to his posses-

sion of the NIJ publication was subsequently expunged, and because he already had completed his period of administrative segregation following his escape.

The petitioner provides no authority for the proposition that department officials were not permitted to consider his interest in learning about perimeter security, and the fact that he previously had escaped from Osborn and attempted to escape on two other occasions, in evaluating whether he should be placed in administrative segregation, and our independent research has uncovered no such authority. This is not surprising, because we cannot perceive of any reason why it was improper for department officials to consider this information. To the contrary, it is well established that prison officials, in determining the appropriate security classification for inmates, often and for good reason must rely on an inmate's past conduct as a predictor of his or her future behavior. See, e.g., *Meachum* v. *Fano*, 427 U.S. 215, 225, 96 S. Ct. 2532, 49 L. Ed. 2d 451 (1976) ("[t]ransfers between institutions, for example, are made for a variety of reasons and often involve no more than informed predictions as to what would best serve institutional security or the safety and welfare of the inmate"); *Crawford* v. *Lappin*, 446 Fed. Appx. 413, 415 (3d Cir. 2011) (rejecting inmate's claim that his placement in administrative segregation violated due process because decision was predicated, in part, on conduct for which he already had been disciplined, and explaining that "due process is not violated by placing an inmate in administrative custody based on past conduct when that conduct provides a basis for predicting [future misconduct]"); *Shoats* v. *Horn*, 213 F.3d 140, 146 (3d Cir. 2000) ("[e]ven [if the court] conclude[d] that [the prisoner's] continued confinement in administrative custody [was] based solely on his past crimes, the process he received would nonetheless pass constitutional muster, because predictions of likely future behavior based on a generally volatile criminal character have been upheld by the [United States] Supreme Court").

Moreover, as Levesque explained at the habeas trial, the prior hearing relating to the petitioner's possession of the NIJ publication was a disciplinary proceeding held for the purpose of determining whether the petitioner had violated any prison rules. The fact that it was later determined that that publication was not contraband—apparently because it had been approved by prison mail room personnel—was immaterial to the issue of whether the petitioner could be safely managed in the general population in light of his undiminished interest in perimeter security and all that that interest implied for an inmate with his escape history. Levesque testified that, as far as he was concerned, there was absolutely no legitimate reason for any inmate to concern himself with a prison's perimeter security system, much less so an inmate with the petitioner's prior his-

tory of escapes, and that it was for this reason—to ensure the safety and security of the prison as well as the public—that department officials ultimately concluded that the petitioner should be returned to administrative segregation. Although the petitioner obviously disagrees with this decision, we cannot conclude that it was unjustified, or that the evidence otherwise did not support it.[11]

In this regard, it bears emphasis that "a prison's internal security is peculiarly a matter normally left to the discretion of prison administrators. In assessing the seriousness of a threat to institutional security, prison administrators necessarily draw on more than the specific facts surrounding a particular incident; instead, they must consider the character of the inmates confined in the institution, recent and longstanding relations between prisoners and guards, prisoners inter se, and the like. In the volatile atmosphere of a prison, an inmate easily may constitute an unacceptable threat to the safety of other prisoners and guards even if he himself has committed no misconduct; rumor, reputation, and even more imponderable factors may suffice to spark potentially disastrous incidents. The judgment of prison officials in this context, like that of those making parole decisions, turns largely on purely subjective evaluations and on predictions of future behavior . . . ." (Citation omitted; internal quotation marks omitted.) *Hewitt* v. *Helms*, supra, 459 U.S. 474. It therefore is not the role of this court to second-guess that decision, especially when, as in the present case, there is ample reason, based on the undisputed evidence, to support it. See, e.g., *Superintendent* v. *Hill*, supra, 472 U.S. 455 ("that due process requires some evidentiary basis for a decision . . . does [not] imply that a disciplinary board's . . . decisions . . . are subject to second-guessing upon review"); *Bell* v. *Wolfish*, 441 U.S. 520, 547, 99 S. Ct. 1861, 60 L. Ed. 2d 447 (1979) ("[p]rison administrators . . . should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security").

As we have explained, however, the habeas court apparently misunderstood the petitioner's claim, and, as a result, its reason for rejecting the claim is unsustainable. See footnotes 6 and 7 of this opinion. Consequently, the Appellate Court incorrectly determined that the habeas court acted within its discretion in dismissing the petitioner's petition for certification to appeal from the habeas court's judgment. Because, however, the petitioner cannot prevail on his claim that he was denied due process prior to being placed in administrative segregation, we conclude that the habeas court properly had determined that the petitioner's habeas petition must be denied.

The form of the judgment of the Appellate Court is improper, the judgment of the Appellate Court is reversed, and the case is remanded to that court with direction to affirm the judgment of the habeas court denying the petition for a writ of habeas corpus.

In this opinion the other justices concurred.

[1] Department of Correction Administrative Directive 9.4 (3) (B) defines "administrative segregation" as "[p]lacement of an inmate on a restrictive housing status that results in segregation of the inmate whose behavior or management factors pose a threat to the security of the facility or a risk to the safety of staff or other inmates and that the inmate can no longer be safely managed in general population."

[2] We granted the petitioner's petition for certification to appeal, limited to the following question: "Did the Appellate Court improperly conclude, contrary to the rule of *Sandin* v. *Conner*, [supra, 515 U.S. 472], and *Wilkinson* v. *Austin*, [supra, 545 U.S. 209], that the petitioner had no liberty interest in avoiding administrative segregation?" *Vandever* v. *Commissioner of Correction*, 307 Conn. 909, 53 A.3d 999 (2012).

[3] The hearing notice provided in relevant part: "Reason for Hearing: On [October 21, 1997] . . . you received a [c]ontraband [c]lass A disciplinary report substituted for [c]onspiracy to [c]ommit [e]scape. The contraband you possessed was documentation detailing electronic perimeter technology found in correctional facilities. The documentation you recently held, combined with your escape record, may pose a threat to the safety and security of the institutional community. Therefore, a special classification hearing will be held . . . to consider you for placement on [a]dministrative [s]egregation status. You will have the opportunity, at this hearing, to offer any statements on your behalf . . . .

"[You may request] a staff advocate to act [on] your behalf . . . . A reasonable number of relevant and nonredundant witnesses may appear on your behalf. . . ."

[4] General Statutes § 18-98a provides: "Each person committed to the custody of the Commissioner of Correction who is employed within the institution to which he was sentenced, or outside as provided by section 18-100, for a period of seven consecutive days, except for temporary interruption of such period as excused by the commissioner for valid reasons, may have one day deducted from his sentence for such period, in addition to any other earned time, at the discretion of the Commissioner of Correction."

Department of Correction Administrative Directive 9.4 (5) provides: "An inmate shall not earn or receive statutory good time, seven-day work credit, restoration of lost good time or outstanding meritorious performance awards while on Administrative Segregation, Close Custody, Chronic Discipline Status or Special Needs Management."

[5] The record indicates that the disciplinary report ultimately was withdrawn due to concerns over whether the NIJ publication actually constituted contraband in light of the fact that it inadvertently had been stamped "approved" by officials in the mail room at Osborn.

[6] In reaching this determination, the habeas court relied on *Abed* v. *Commissioner of Correction*, 43 Conn. App. 176, 682 A.2d 558, cert. denied, 239 Conn. 937, 684 A.2d 707 (1996), and *Beasley* v. *Commissioner of Correction*, 50 Conn. App. 421, 718 A.2d 487 (1998), aff'd, 249 Conn. 499, 733 A.2d 833 (1999). As we explain more fully hereinafter; see footnote 7 of this opinion; the habeas court misunderstood the petitioner to be claiming a statutory or constitutional right to the good time and work credits that he was ineligible to earn while in administrative segregation. It is clear from the record, however, that the petitioner recognized that the foregoing authority precluded such a claim, and that he sought the credits only as a remedy for the due process violation that he allegedly had suffered.

[7] We note that the respondent also asserted at oral argument that the petitioner never claimed in the habeas court that he had a liberty interest in avoiding administrative segregation, only that he had a right to the statutory good time credit that he was ineligible to earn while he was in administrative segregation. A review of the record, however, reveals that the petitioner's claim was squarely before the habeas court, and that that court simply failed to address it. In his habeas petition, which he initiated on a form provided to him, the petitioner selected box "6c," indicating that his "hearing on . . . classification . . . [was] improper . . . ." In an attachment to his petition, he clarified that he was referring to his administrative segregation hearing.

The petitioner also argued in his posttrial brief to the habeas court that "placement of an [inmate in administrative segregation] mandates a proper due process . . . and is not any discretional or classification process. . . . The placement of an [inmate in administrative segregation] creates a liberty interest because [statutory good time] is denied, and it represents an atypical and significant hardship from ordinary prison life." (Citations omitted; internal quotation marks omitted.) In support of this claim, the petitioner expressly relied on *Sandin*, which establishes the framework for evaluating whether a prisoner has a liberty interest in avoiding administrative segregation. Accordingly, the habeas court's reason for denying the habeas petition, namely, that the award of good time and work credits is entirely within the discretion of the respondent, cannot be sustained because it is based on a claim that the petitioner never made.

[8] Appellate review of the habeas court's denial of a petition for certification to appeal is governed by General Statutes § 52-470 (g), which provides: "No appeal from the judgment rendered in a habeas corpus proceeding brought by or on behalf of a person who has been convicted of a crime in order to obtain such person's release may be taken unless the appellant, within ten days after the case is decided, petitions the judge before whom the case was tried or, if such judge is unavailable, a judge of the Superior Court designated by the Chief Court Administrator, to certify that a question is involved in the decision which ought to be reviewed by the court having jurisdiction and the judge so certifies."

We previously have explained that, in enacting this statute, "the legislature intended to discourage frivolous habeas appeals. . . . A habeas appeal . . . is not . . . frivolous and warrants appellate review if the appellant can show: that the issues are debatable among jurists of reason; that a court could resolve the issues [in a different manner]; or that the questions are adequate to deserve encouragement to proceed further. . . . [I]f an appeal is not frivolous, the habeas court's failure to grant certification to appeal is an abuse of discretion. . . .

"In determining whether the habeas court abused its discretion in denying the petitioner's request for certification, we necessarily must consider the merits of the petitioner's underlying claims to determine whether the habeas court reasonably determined that the petitioner's appeal was frivolous. In other words, we review the petitioner's substantive claims for the purpose of ascertaining whether those claims satisfy one or more of the three criteria [that we have] identified . . . for determining the propriety of the habeas court's denial of the petition for certification." (Citations omitted; internal quotation marks omitted.) *Taylor* v. *Commissioner of Correction*, 284 Conn. 433, 448–49, 936 A.2d 611 (2007).

[9] Department of Correction Administrative Directive 9.4 (12) provides that, before an inmate can be placed on administrative segregation status, he must receive "notice and a hearing" that comply with the specific procedures outlined in subparagraphs (A) and (B) of 9.4 (12) of the directive. Pursuant to 9.4 (12) (C), the hearing officer is also required to issue a written recommendation that includes the information he or she relied on and the reasoning behind the recommendation.

This directive satisfies the first prong of *Sandin* because it requires, "in language of an unmistakably mandatory character, that a prisoner not suffer a particular deprivation"—in this case, placement in administrative segregation at Northern—"absent specified predicates." (Internal quotation marks omitted.) *Vega* v. *Lantz*, 596 F.3d 77, 83 (2d Cir. 2010).

[10] We granted the application of the American Civil Liberties Union of Connecticut and the Allard K. Lowenstein International Human Rights Clinic (Human Rights Clinic) to file a brief as amici curiae in support of the petitioner's claim of a due process violation, and we also granted permission to the Human Rights Clinic to present oral argument in this court not to exceed ten minutes.

[11] To the extent that the petitioner contends that his double jeopardy rights were violated by his placement in administrative segregation on the basis of conduct that previously had resulted in prison discipline, that claim also is without merit because the double jeopardy clause is not implicated by such a placement. See, e.g., *Crawford* v. *Lappin*, supra, 446 Fed. Appx. 415 ("Nor is there any basis for [the petitioner's] claim that placement [in administrative segregation] based on previously disciplined conduct constitutes a double jeopardy violation. See *United States* v. *Newby*, 11 F.3d 1143, 1144 (3d Cir. 1993) ([A] prison disciplinary hearing is not a prosecution for [d]ouble [j]eopardy [c]lause purposes.).") [Internal quotation marks omitted.]).